# JUDGE KARAS



Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
JO TANKERS BV



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JO TANKERS BV,<br><br>       Plaintiff,<br><br>    -against-<br><br>TIANJIN LONGWIT OILS AND GRAINS<br>INDUSTRIAL CO. LTD.,<br><br>       Defendant. | 07 Civ. _____(_____)<br><br>**VERIFIED COMPLAINT** |

Plaintiff, Jo Tankers BV ("Jo Tankers" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Tianjin Longwit Oils and Grains Industrial Co. Ltd. ("Tianjin Longwit" or "Defendant"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff Jo Tankers was and is a business entity organized and existing under the laws of The Netherlands and maintains its principal place of business at Curieweg 19 (5th Floor), 3208 KJ Spijkenisse, The Netherlands.

3.      Upon information and belief, at all times material herein, defendant Tianjin Longwit is a business entity organized and existing under the laws of the People's Republic of China, with its correspondence office at No. 136, The 5th Coastal Way, Tianjin Port Free Trade Zone, China, 300461.

4.      On or about March 16, 2007, Jo Tankers, as owner, and Tianjin Longwit, as charterer, entered into a voyage Charter Party for the charter of M/T JO LONN (the "Charter"). The Charter consists of the fixture contained in an e-mail between the parties dated March 16, 2007, and the Main Terms and Additional Chartering Clauses supplied by Tianjin Longwit dated March 1, 2007, incorporating by reference the VEGOIL VOY Charter Party Terms. A true and correct copy of the Charter is annexed as Exhibit 1.

5.      Under the terms of the Charter, Jo Tankers agreed to carry 15,500 metric tons crude palm oil , 2% more or less at Jo Tankers' option, for US$ 42.00 per metric ton from Belawan, Indonesia to Tianjin, N. China.

6.      On or about March 29, 2007, Tianjin Longwit requested a change to the type of cargo specified under the Charter after encountering trouble with its source of palm oil.  Jo Tankers accepted the change from crude palm oil to RBD Olein provided the quantity was still as per the original fixture.

7.      On or about March 30, 2007, the Defendant sent an e-mail to the Plaintiff confirming the agreed-upon change of cargo under the Charter and the revised documents.  A true and correct copy of the revised fixture recap dated March 30, 2007 is annexed as Exhibit 2.

8.      Under the new terms agreed upon by the parties, Jo Tankers agreed to carry 15,500 metric tons, 2% more or less at Jo Tankers' option, of RBD Olein from Belawan, Indonesia to Tianjin, N. China.

9.      On or about April 5, 2007, Tianjin Longwit requested a second amendment to the Charter. Tianjin Longwit requested that Jo Tankers agree to a different voyage, which entailed loading in Dumai, two additional stops in Nantong and Zhangjiagang, and discharge in Tianjin.

10.     Jo Tankers accepted the proposed amendment to the voyage, stating it would charge US$ 60,000 per added port stop to compensate for increased costs associated with additional loading, discharging, and delay. Accordingly, Jo Tankers requested an additional cost of US$ 120,000 for the different voyage proposed by the Defendant.

11.     On or about April 10, 2007, Tianjin Longwit responded via e-mail that their suppliers had defaulted on their sales contract, would not supply any cargo, and claimed *force majeure* under Clause 40 of the Charter.

12.     The Defendant's failure to provide the requisite cargo constitutes a breach of the Charter agreed to by the parties on or about March 16, 2007.

13.     As a result of Tianjin Longwit's breach of the Charter, Jo Tankers was forced to accept another partial cargo below market rate which also included additional ports of call. Under the terms of the Charter, the Defendant was to supply 15,500 mts of oil at US$ 42.00/day. Together with another partial cargo, the Plaintiff would have realized a profit of US$ 18,351.00 per day over 34.38 days. In order to mitigate damages, Jo Tankers accepted a cargo 9,000 mts of oil at US$ 40.000/day. As such, the Plaintiff only realized a profit of US$ 7,982.00 per day over 33.94 days.

14.   The principal sum of Jo Tankers' mitigated damages is US $ 359,998.30, exclusive of interest, costs and reasonable attorney's fees.

15.   Clause 41 of the Charter provides for the application of English Law.  Under English law, Jo Tankers is also entitled to recover interest (currently 8.25%), costs, and attorneys fees expended while prosecuting its claims to completion, which amount is estimated to be US$ 159,399.72, as set forth below:

Interest:                          $  59,399.72 ($ 359,998.30 x 0.0825/year x 2 years)

Attorneys' Fees/Expenses:     $ 100,000.00__

Total Interest/Fees/Expenses: $ 159,399.72

Total Principal Claim:          $ 359,998.30_

Total Sought:                   **$ 519,398.02**_

16.   Tianjin Longwit's failure to procure cargo did not rise to the level of *force majeure,* and its breach of the Charter resulted in total aggregate damages of US$ 519,398.02.

17.   Tianjin Longwit is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Tianjin Longwit Oils and Grains Industrial Co. Ltd. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Fortis Financial Groups; Banco Popular; China Trust Bank; Great Eastern Bank; Industrial Bank of Korea; Nara Bank; Shin Han Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

18. The Charter provides for arbitration in New York. The action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Jo Tankers BV demands judgment as follows:

1. That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Tianjin Longwit Oils and Grains Industrial Co. Ltd. with the financial institutions noted above in paragraph 17;

2. That Tianjin Longwit Oils and Grains Industrial Co. Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3. That judgment be entered in favor of Jo Tankers BV and against Tianjin Longwit Oils and Grains Industrial Co. Ltd. in the amount of US$ 519,398.02 (including estimated interest, expenses and attorneys' fees); and,

4. That this Court grant Jo Tankers BV such other and further relief which it may deem just and proper.

Dated: New York, New York
    July 20, 2007

                    HOLLAND & KNIGHT LLP

        By: _____
                    Michael J. Frevola
                    Lissa D. Schaupp
                    195 Broadway
                    New York, NY 10007-3189
                    Tel:    (212) 513-3200
                    Fax:    (212) 385-9010

                    *Attorneys for Plaintiff*

## VERIFICATION

STATE OF NEW YORK        )

                                 :ss.:

COUNTY OF NEW YORK      )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Jo Tankers BV ("Jo Tankers"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Jo Tankers and corresponded with Jo Tankers' representatives regarding this matter. I am authorized by Jo Tankers to make this verification, and the reason for my making it as opposed to an officer or director of Jo Tankers is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
20th day of July, 2007

_____
Notary Public

# 4682179_v1

6

# EXHIBIT 1

**Gregg Plunkett**

| | |
|---|---|
| From: | Chartering Th. B.E. Moors [chartering@bemcobkk.com] |
| Sent: | Friday, March 16, 2007 6:12 PM |
| To: | Gregg Plunkett |
| Subject: | Jo Lonn / Tianjin longwit C/P 16th Mar '07 -Clean Fixture Recap-/ - New - |

   

Tianjin Longwit Main   RMarpol Prewash   charterparty        Jo
Terms Ri...          Clause.pdf (50...  vegoilvoy.doc (86...Questionnaire 88_1;

                                              TO:    Jo Tankers Asia Pte. Ltd.
ATT:  Gregg Plunkett

FM:   MORTEN / JACOB D. LEMBRING
      B.E. MOORS

  :   Jo Lonn / Tianjin longwit C/P 16th Mar '07 -Clean Fixture
Recap-/ - New -


Good afternoon Gregg,

==============================
Please find corrected Terms attached.
Correction:
Clause: 31 line 1.
Tianjin Longwit Oils and Grains Industrial Co. Ltd.,
Other Chrtrs name had not been changed.

Clause: 39 line 2.
within ninety (30) days
To,
within ninety (90) days
==============================

We are pleased to re-cap the following clean-fixture concluded, Friday 16th March 2007,
with the following terms and conditions.

 ***
Charter Party:    Friday 16th March 2007

Chrtrs:          Tianjin Longwit Oils and Grains industrial Co. Ltd
                 No. 136, The 5th Coastal Way
                 Tianjin Port Free Trade Zone
                 China, 300461
                 Tel: 86 (0) 22 2576 0005
                 Fax: 86 (0) 22 2576 3701

Owners:          Jo Tankers BV
                 Societe Generale
                 London
                 United Kingdom
                 IBAN code: SG51 SOGE 236391 31005200
                 Swift: SOGEGB2LLON
                 Through intermediary bank
                 Societe Generale
                 New York
                 Swift: SOGEUS33

Vessel:          Jo Lonn / OOS (Q88 Attached)

For,

1

```
Cargo:            15,500mts Crude Palm Oil 2% MOLOO
Loading:          1sb Belawan, Indonesia
Discharge:        1sb Tianjin, N. China

Freight:          USD$42.00pmt
Laycan:           April 10-25
Laytime:          125/125 shinc rev
Demm:             USD$20,000pdpr
Comm:             Total commission 2.5 pct on freight, demurrage, dead
freight payable to B.E. Moors Inc.

Freight Payment: Freight to be t.t. remitted directly from
charterers to the owners' account BBB (Before Breaking Bulk)

C/P:              Vegoilvoy
Stowage:          Cargo will be stowed in Stainless Center Tanks

Other terms:
        -Revised Tianjin Longwit Main Term Rider Clauses as per attached
        -MARPOL Pre wash clause as per attached

Last Cargo: Phosphoric Acid/palms/phos acid

Tentative intinerary

Paradip:     April 2 - 4
Haldia         April 4 - 6
Straits        April 11 - 16
Mid China   April 25 - 30
Tianjin        April 30 - May 5

*****

We thank you for your patience, support and cooperation that led to above clean fixture.

BEST REGARDS,
B.E. MOORS BANGKOK
MORTEN HAMMER          66-81-931-5623     YAHOO: MORTEN_HAMMER2002
JACOB D. LEMBRING 66-81-831-1604    YAHOO / SKYPE: JACOBDANMARK /
JACOBBEMOORS
OFFICE:                66-2-631-2323
FAX:                   66-2-631-2788
MAIL:                  CHARTERING@BEMCOBKK.COM
```

VEGOILVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

CHARTER PARTY made as of ......................................................, 19    , at ................................................................

by and between ....................................................................................................................................................................

(hereinafter called the "Owner") of the good ...................................MS/SS ..................................................................

(hereinafter called the "Vessel") and ....................................................................................................................................

Charterer (hereinafter called the "Charterer").

(a)    The Vessel shall receive from the Charterer or supplier at the port or ports of loading, or so near thereto as she may safely get, always afloat, the cargo described in Part I, for delivery as ordered on signing bills of lading to the port or ports of discharge, or so near thereto as she may safely get always afloat; and there discharge the cargo; all subject to the terms, provisions, exceptions and limitations contained or incorporated in this Charter Party, which shall include the foregoing preamble and Parts I and II. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

Each of the provisions of this Charter Party shall be and be deemed severable, and if any provision or part of any provision should be held invalid, illegal or unenforceable, the remaining provisions or part or parts of any provisions shall continue in full force and effect.

## PART I

**A.  Description and Position of Vessel.**

  Net Registered Tonnage:

  Total Deadweight:            tons of 2,240 lbs. each on            draft in salt water on assigned summer freeboard.

  Capacity for cargo:          bbls. of 42 American gallons each at 60° F. or            tons of 2,240 lbs. each (10%
    more or less, Vessel's option).

  Classed:            Now:

**B.  Part—Full Cargo.**

  If this Charter Party is for a full cargo, then it shall be the quantity the Vessel can carry if loaded to her minimum permissible freeboard for the voyage, but not exceeding what the Vessel can, in the Master's judgment, reasonably stow and carry over and above her tackle, apparel, stores, and furniture, sufficient space to be left in the expansion tanks to provide for the expansion of the cargo. In no event shall Charterer be required to furnish cargo in excess of the quantity stated as the Vessel's capacity for cargo plus 10% of that quantity. If less than a full cargo is to be carried, the quantity stated shall be the minimum quantity which the Charterer is required to supply.

**C.  Loading Port.**

  Readiness Date:            Cancelling Date:

**D.  Discharging Port.**

**E.  Total Laytime            for loading;            for discharging
    (Running Hours.)**

**F.  Freight Rate.**

                                    Freight Payable at:

**G.  Demurrage per Hour.**

**H.  Special Provisions.—**

IN WITNESS WHEREOF the parties hereto have executed this agreement, in duplicate, as of the day and year first above written.

Witness to signature of:

..............................................................................

By: ..........................................................................

Witness to signature of:

..............................................................................

By: ..........................................................................

1. **WARRANTY.** (a) The Owner shall, before and at the commencement of the voyage, exercise due diligence to make the Vessel seaworthy, properly manned, equipped, and supplied for and during the voyage, and to make the pipes, pumps, and heater coils tight, staunch, and strong, in every respect fit for the voyage, and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation.

(b) It is understood that if the tank or tanks, into which the particular cargo covered by this Charter is to be placed, upon testing prove to be defective the Owner undertakes to execute the necessary repairs, provided repairs can be effected within 24 hours and at reasonable expense; otherwise, Owner has the option of cancelling this Charter in which case no responsibility shall rest with the Vessel, Owners, or Agents.

2. **TIME FOR READINESS OF CARGO.** Charterer warrants that the cargo shall be available for loading at the designated loading port upon arrival of the Vessel within the Readiness and Cancelling date shown in Part I hereof. Any delay suffered by the Vessel for failure to conform to this warranty shall count as used lay time.

3. **READINESS AND CANCELLING DATE.** Laytime shall not commence before the readiness date named in Part I, unless otherwise provided in this Charter, or unless the Charterer accepts a notice of readiness or orders or permits the Vessel to berth before that date, or otherwise waives the provisions of this paragraph. If the Vessel is not ready to load by 4.00 p.m. (local time) on the cancelling date named in Part I, the Charterer shall have the option of cancelling this Charter by giving the Owner notice of such cancellation within twenty-four (24) hours after the cancelling date; otherwise this Charter shall remain in full force and effect. The Charterer may in its notice of cancellation specify that it will nevertheless accept the Vessel if she is ready to load on or before a date or time that Charterer may designate in such notice in which event the Owner may at its option either treat this Charter Party as cancelled or tender the Vessel on or before the date named by the Charterer in its notice, whereupon this Charter shall remain in full force and effect.

4. **NOTICE OF READINESS AND COMMENCEMENT OF LAYTIME.** (a) When the Vessel has arrived at the port of loading or discharge and is ready to load or discharge, a notice of readiness shall be tendered to the Charterer or its agent by the Master or Agent by letter, telegraph, wireless or telephone. The Vessel shall be deemed ready within the meaning of this clause whether she arrives during or outside of usual business hours, whether she is in or out of berth or whether or not she has ballast water or slops in her tanks. Laytime shall commence either at the expiration of six (6) running hours after tender of notice of readiness, berthed or not, whether customary berth or not, or upon the Vessel's arrival in berth (i.e. finished mooring when at a loading or discharging terminal and all fast when loading or discharging alongside a wharf) with or without notice of damage, whichever first occurs.

(b) Notwithstanding anything contained in paragraph (a) of this clause, laytime shall commence when the Vessel arrives at the loading or discharging port, whether or not berth is available; provided that notice of readiness shall always be tendered as therein stipulated.

5. **LAYTIME.** (a) The number of running hours specified as laytime in Part I shall be permitted the Charterer for loading, discharging, and used laytime; but any delay due to breakdown or inability of the Vessel's facilities to load or discharge the cargo within the time allowed shall not count as used laytime. If regulations of the Owner prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee, or the port authorities prohibit loading or discharging at night, time so lost shall count as used laytime. The Vessel shall have the right to sail from all ports immediately upon the completion of loading or discharging whether or not laytime has expired.

(b) Where commingled shipments, or separate shipments, are loaded or discharged concurrently at the same installation, the laytime allowed to each shipper shall be the gross number of hours allowed any of the commingled or separate shipments, it being conclusively presumed that loading and discharging of all such shipments shall commence simultaneously.

6. **SAFE BERTH, SHIFTING.** (a) If under Part I hereof the Charterer is given the right to name the loading and discharging berth, the Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer.

(b) If under Part I hereof the Charterer is given the right to load or discharge at more than one berth, the Charterer shall arrange with the agent of the Vessel for shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to the next berth, charges for running lines on arrival at and leaving that berth, wharfage and dockage charges at that berth, additional agency charges and expense, Customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time lost to the Vessel on account of shifting shall count as used laytime.

(c) Notwithstanding anything contained in paragraphs (a) and (b) of this clause, the Charterer warrants that the cargo shall be discharged at the ports and berths specified in Part I. Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between Charterer and Owner, and in such case, Charterer shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby.

(d) **Lighterage.** Lighterage at port of loading shall be at the risk and expense of Charterer. The Charterer shall deliver cargo to and alongside the Vessel as instructed by the Owner; and the Owner shall provide a berth immediately alongside the Vessel for the barge or barges carrying the cargo after which pumping shall commence and proceed continuously.

7. **PUMPING IN AND OUT, HOSES.** (a) The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or consignee. The Vessel shall furnish her pumps and the necessary steam for discharging in all ports where the regulations permit of fire on board, but if not steam necessary hands. Should regulations not permit fire on board, the Charterer or consignee shall supply, at its expense, all steam necessary for discharging as well as loading, but the Owner shall pay for steam supplied to the Vessel for all other purposes. If cargo is loaded from lighters, the Vessel, if permitted to have fires on board, shall, if required, furnish steam to lighters at Charterer's expense for pumping cargo into the Vessel.

(b) Hoses—All hoses inquirable to fit Vessel's connection) and other necessary equipment and labor to accomplish delivery of cargo to be provided by Charterer at Charterer's risk and expense.

(c) Stevedoring—If stevedoring is required, it is to be arranged and paid for by the Charterer.

(d) Steam—Vessel to furnish steam at its expense for the operation of receiver's pumps at port of discharge.

(e) Squeegeeing—Squeegeeing to be paid by the Owner and time used is not to count as used laytime.

(f) When shipments are commingled before loading—The cargo to be carried pursuant to this Charter Party has been or will be commingled with cargo belonging to other Charterers prior to loading, and will be loaded into the tanks of the Vessel without separation or identification. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for separation of the several consignments at the time of delivery. The Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage that the amount specified in the Bill of Lading issued for the cargo covered by this Charter Party bears to the total of the commingled shipments delivered at destination.

(g) When shipments are to be commingled upon loading in the tanks of a vessel—It is understood that the Vessel will carry cargoes supplied by other Charterers to be carried subject to the terms of substantially similar part-cargo charter parties. Where the products are similar, the Vessel shall have the right to commingle such products in the tanks of the Vessel, in which case the Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage that the amount specified in the bill of lading bears to the total of the commingled shipments delivered at destination. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for the separation thereof at the time of delivery.

(h) Unless mention or exception is made in writing on the bill of lading,

(b) If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to the infected wharf he shall bear the expense of fumigation.

15. **CLEANING.** Prior to loading, Charterer shall inspect the designated tanks for the purpose of determining that they are in suitable condition for the loading and carriage of the cargo specified hereunder. Acceptance of the tanks by Charterer's representative shall be conclusive as to their suitability for such purposes. If Charterer's representative does not accept the tanks as suitable for the cargo, the Owner shall have the right, at its option, to cancel this Charter Party, without any resulting liability on the part of either party, or to again clean the tanks, subject to inspection as above.

16. **HEATING.** (a) If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperature requested. Notwithstanding any other provisions herein the Owner shall not be responsible if such temperatures are not maintained by reason of any cause beyond the Owner's control and the laytime and demurrage provisions herein shall remain in full force and effect. The burden of proving the failure to exercise due diligence shall be on the Charterer or person claiming damage or other relief. Whenever the Owner's failure to maintain temperatures is excused under this or any other provision of this Charter, Charterer shall nevertheless pay full demurrage by reason of the nature or condition of the cargo and shall pay demurrage if any.

(b) Unless agreed to in writing by Owner, the Vessel is not under any obligation to heat the cargo, but Owner reserves the right to heat the cargo to facilitate discharge.

(c) If Charterer decides that heat ought to be applied to the cargo, Charterer's instructions to Owner will be in the following form: "Please instruct the Master .......... hours before arrival at discharge port to apply heat to cargo so that on arrival at discharge port the temperature about two feet above the coils shall be about .... degrees Fahrenheit and to maintain approximately that temperature during discharge."

17. **GENERAL EXCEPTIONS CLAUSE.** (a) Neither the Vessel nor the Master or Owner shall be or shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from:—Any act, neglect or default of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; barratry; fire, unless caused by the personal design or neglect of the Owner; collision; stranding; perils, dangers or accidents of the seas or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk or any loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer, shipper, consignee, owner of the goods or holder of the bill of lading, their agents and representative; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery, equipment or appurtenances; unseaworthiness of the Vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped, and supplied; leakage; shrinkage; evaporation; change in quality of the cargo; handling or transportation losses; difference between actual or reported intake and outturn quantities; stowage or contact with or leakage from other cargo; discoloration; contamination; deterioration; any consequence arising out of shipping more than one grade of cargo; or from any other cause arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise in this Charter expressly provided, be responsible for any loss of or damage or delay to or failure to deliver or deliver the cargo arising or resulting from:—Act of God; act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided herein promptly furnished to release the Vessel or cargo; strikes, lockouts, stoppage or restraint of labor from whatever cause whether partial or general; riot or civil commotion. No exemption afforded the Charterer under this clause shall relieve the Charterer of or diminish its obligations for payment of any sums due the Owner under other provisions of this Charter.

(b) The tanks having been inspected by the Charterer's inspector as to tightness and cleanliness, notwithstanding any other provision of this Charter, neither the Vessel nor the Owner shall be liable for loss or damage due to contamination, deterioration, discoloration or change in quality or characteristics, or leakage, unless there is negligence on the part of the Owner.

18. **JASON CLAUSE.** In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo, shippers, consignees, or owners of the cargo shall contribute with the Owner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.

19. **BOTH TO BLAME COLLISION CLAUSE.** If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

20. **GENERAL AVERAGE.** General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, at such port or place in the United States as may be selected by the Owner, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment, disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owner, must be furnished before delivery of the cargo. Such cash deposit as the Owner or its agents may deem sufficient as additional security for the contribution of the cargo and for any salvage and special charges thereon, shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owner before delivery. Such deposit shall, at the option of the Owner, be payable in United States money, and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

21. **DEVIATION CLAUSE.** The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage. Any average shall be for the sole benefit of the Owner.

22. **OTHER PORTS.** If this Charter Party is for a part cargo:—(a) Owner has the right, either before or after loading cargo covered by this Charter Party, to load or discharge cargo belonging to the Charterer or others in any ports, rotation of ports to be at Owner's option; (b) Owner has privilege of discharging the cargo covered by this Charter Party at any port and to transship it at Owner's risk and expense by any vessel or other means of transportation by water, or by rail, to the destination shown in Part I of this Charter Party.

23. **LIMITATION OF LIABILITY.** (a) Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force. Nothing in this Charter shall operate to limit or deprive the Owner of any statutory exceptions or limitation of liability on the theory of personal contract or otherwise.

or other shipping document before departure of the vessel from the dock or place at which the said cargo is delivered. receipt of the cargo shall be deemed prima facie evidence of right delivery of the entire cargo as described in the bill of lading; further, that upon failure or refusal by the Charterer or its representative to execute or except to the ullage reports prepared by the vessel, the figures stated in said ullage reports shall be deemed prima facie correct and binding upon the parties hereto.

7. PRODUCTS EXCLUDED, FLASHPOINT. (a) No product shall be shipped which fails to meet one or the other of the two following requirements: (1) The vapor pressure at one hundred degrees Fahrenheit (100° F.) shall not exceed thirteen pounds (13 lbs.) as determined by the A.S.T.M. Method (Reid Method) identified as D-323 current at the time shipment is made. (2) The distillation loss shall not exceed four per cent (4%) and the sum of the distillation loss and the distillate collected in the receiving graduate shall not exceed ten per cent (10%) when the thermometer reads one hundred twenty-two degrees Fahrenheit (122° F.). Note.—The distillation test shall be made by A.S.T.M. Method identified as D-86 current at the time shipment is made. When products other than Naphtha or Gasoline are tested, the distillation loss may be determined by distilling not less than twenty-five per cent (25%) and deducting from one hundred per cent (100%) the sum of the volumes of the distillate and the residue in the flask (cooled to a temperature of sixty degrees Fahrenheit (60° F.)).

(b) No petroleum or its products having a flashpoint under 150° Fahrenheit (Closed Cup Abel Test) shall be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off crude oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

8. FREIGHT. (a) Full freight to the discharging port named in Part I or declared by the Charterer in accordance with this Charter shall be completely earned on all cargo as loaded and the Owner shall be entitled to receive and retain such freight irrevocably under all circumstances whatsoever ship and/or cargo lost or not lost, whether or not the cargo is damaged or unsound, or in the event the voyage is abandoned or broken up.

(b) The freight shall be at the rate stipulated or incorporated in Part I based on the intake quantity as shown by the Inspector's Certificate of Inspection. the services of the Inspector to be arranged and paid for by the Charterer who shall furnish the Owner's Agent with a copy of the Inspector's Certificate.

(c) Freight, less any advances made to the Master at the port or ports of loading, shall, unless otherwise agreed in Part I, be paid in full without discount in United States currency to the Owner's Agent at the Agent's place of business upon receipt by the Agent of figures indicating the quantity of cargo loaded as provided in sub-paragraph (b) above. No deduction in freight shall be made for water and/or sediment contained in the oil.

10. DEADFREIGHT. Charterer will load as much oil as, in the opinion of the Master is required to fill the tanks or tanks (whether such quantity be less than or in excess of the tonnage stated in Part I hereof), failing which Charterer shall pay deadfreight on the quantity short of Master's requirements, or if, as a result of the Charterer's failure to deliver on board the quantity required by the Master, there is in the tank or tanks not sufficient to render it, in the opinion of the Master, safe for the voyage, he shall be at liberty to require Charterer to remove the oil loaded at Charterer's expense and risk and Charterer agrees to pay deadfreight at the rate per ton stipulated in Part I hereof on the full oil capacity of the tank or tanks.

11. DEMURRAGE. (a) Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time used loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because of fire or explosion or about the plant, or because of breakdown of machinery or landing or discharging facilities of the Charterer, shipper or consignee of the cargo, the rate of demurrage shall be reduced to one-half the rate stipulated in Part I hereof per running hour and pro rata of such reduced rate for part of an hour for demurrage so incurred.

(b) Where commingled or separate shipments are loaded or discharged at the same installation, demurrage shall be apportioned among such shipments in proportion to the ratio which each bears to the aggregate thereof; provided, however, that where the cause of the delay results from the act of any specific charterer or shipper, the total demurrage on the vessel shall be charged against such charterer or shipper and such shipment.

(c) Dispatch—No dispatch money shall be payable under this Charter.

12. DUES, WHARFAGE, TAXES. The vessel shall be free of any wharfage, dockage, quay dues or similar charges at all loading and discharging ports. Entrance and clearance fees whether measured by the volume of cargo or not, towing and tug charges, pilotage, dues, and other usual port charges on the Vessel shall be paid by the Owner. All other dues, duties, imposts, assessments, and charges on the cargo whether in effect at present or whether imposed on the cargo including but without limitation any habilitation tax, Customs overtimes, taxes on freight at loading or discharging ports as well as any unusual taxes, assessments or governmental charges whether in effect at present or whether imposed on the Vessel or freight in the future and whether or not measured by the volume of the cargo, shall be paid by the Charterer.

13. ICE. The Vessel shall not be ordered to or bound to enter any ice-bound port or place or any place where there is lights, lightships, marks or buoys on Vessel's arrival are or are likely to be withdrawn by reason of ice or where there is risk that ordinarily the Vessel will not be able on account of ice to enter, reach or leave the place. The Vessel shall not be obliged to force ice. If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in and/or damaged, he shall have the liberty to sail to another place or port which is free from ice and at which there are facilities for loading or discharging cargo and there await Charterer's further instructions. The whole of the time occupied from the time the vessel is diverted by reason of ice or other conditions until her arrival at an ice-free port as well as any deviation by reason of ice or any of the above reasons shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

14. QUARANTINE. (a) Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay. The Owner shall be entitled to all the liberties specified in Clause 29.

(b) The Owner and the Vessel in all matters arising under this Charter Party or any bill of lading issued hereunder shall be entitled to the like privileges and rights, and immunities as are contained in Sections 3 and 4, and 11 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936.

(c) Neither the Vessel nor Owner, nor any corporation owned by, subsidiary to or associated or affiliated with the Vessel or Owner shall be liable to answer for or make good any loss or damage to the cargo occurring at any time and even though before loading on or after discharge from the Vessel, by reason or by means of any fact whatsoever, unless such fire shall be caused by the Owner's design or neglect.

34. BILLS OF LADING. Bills of lading in the form appearing below for cargo shipped shall be signed by the Master or Agent as requested. Any bill of lading signed by the Master or Agent of the Vessel or another ship subject to all such terms, conditions and exceptions of this Charter and shall be subject to all such terms, conditions and exceptions. The Charterer shall indemnify the Owner, the Master, and the Vessel from all consequences or liabilities that may arise from the Charterer or its agents or the Master or Vessel's agents signing bills of lading or other documents inconsistent with this Charter or from any irregularity in papers supplied by the Charterer or its agents, or from complying with any orders of the Charterer or its agents.

35. LIEN. The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage and costs, including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any bills of lading covering the same, or of any storageman.

16. AGENTS. The Owner shall appoint Vessel's agents at all ports.

17. SUBSTITUTION. Owner has option to substitute another vessel provided she can report within the readiness and cancelling dates, and is suitable for the cargo, shown in Part I hereof.

28. ASSIGNMENT. Subject to the approval of Owner, the Charterer shall have the option of subletting or assigning this Charter to any individual or company, but the Charterer shall always remain responsible for the due fulfillment of this Charter in all its terms and conditions.

19. LIBERTY CLAUSES. (a) In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Owner or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the Vessel or any part of her cargo, or to render it unsafe, imprudent, or unlawful for any reason to commence or proceed on or continue the voyage or to enter or discharge the cargo at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, the Owner may before loading or before the commencement of the voyage, require the shipper or other person entitled thereto to take delivery of the cargo at port of shipment and upon their failure to do so, may warehouse the cargo at the risk and expense of the cargo; or the Owner or Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the cargo there, may discharge the cargo into depot, lazaretto, craft or other place; or the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances, and discharge the cargo, or any part thereof, at any such port or place; or the Owner or the Master may retain the cargo on board until the return trip or until such time as the Owner or the Master thinks advisable and discharge the cargo at any place whatsoever as herein provided or the Owner or the Master may discharge and forward the cargo by any means at the risk and expense of the cargo. The Owner may, when practicable, have the Vessel sail and discharge the cargo at another or substitute port declared or requested by the Charterer. The Owner or the Master is not required to give notice of discharge of the cargo, or the forwarding thereof as herein provided. When the cargo is discharged from the Vessel, as herein provided, it shall be at its own risk and expense; such discharge shall constitute complete delivery and performance under this contract and the Owner shall be freed from any further responsibility. For any service rendered to the cargo as herein provided the Owner shall be entitled to a reasonable extra compensation.

(b) The Owner, Master and Vessel shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppage, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the Vessel, the right to give such orders or directions. Delivery or other disposition of the cargo in accordance with such orders or directions shall be a fulfillment of the contract voyage. The Vessel may carry contraband, explosives, munitions, warlike stores, hazardous cargo and may sail armed or unarmed and with or without convoy.

(c) In addition to all other liberties herein the Owner shall have the right to withhold delivery of, remain to, deposit or discharge the cargo at any place whatsoever, surrender or dispose of the cargo in accordance with any direction, condition or agreement imposed upon or exacted from the Owner by any government or department thereof or any person purporting to act with the authority of either of them. In any of the above circumstances the cargo shall be solely at their risk and expense and all expenses and charges so incurred shall be payable by the owner or consignee thereof and shall be a lien on the cargo.

30. PRIORITY. All agreements of the Owner contained in this Charter Party shall be subject to any orders or instructions of priority or requisition issued by the United States Government or the Government of the flag of the Vessel or any agencies thereof, or the requirement of naval or military authorities or other agencies of Government.

81. ARBITRATION. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York. Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act, and a judgment of the Court shall be entered upon any award made by said arbitrator. Nothing in this clause shall be deemed to waive Owner's right to lien on the cargo for freight, dead freight or demurrage.

22. APPROVAL. If U. S. Government approval is required, this Charter Party is subject to that approval.

## BILL OF LADING

Shipped in apparent good order and condition by ...........................................................................................................

on board the ..........................................................   Motorship/
Whereof .................................................................   Steamship
a quantity said to be ...........................................   pounds/tons/barrels/gallons of
measurement, weight, gauge, quality, nature, value and condition of the cargo are based on information given by the shipper and are unknown to the Vessel and the Master, to be delivered at the port of ............................................   or so many thereof as the Vessel can safely get, always afloat, make
.................................................................................
or under on payment of freight at the rate of ...........................
This shipment is carried under and pursuant to the terms of the Charter dated ...............
at ...................................................... between .........................................................
and ......................................................................... as Charterers, and all the terms
of the said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge being in territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act or other similar legislation. If any term of this Bill of Lading is repugnant to the said Act or other similar legislation so as incorporated, such term shall be void to that extent but no further.

In Witness Whereof, the Master has signed ..................................................................................   Bills of Lading of
this tenor and date, one of which being accomplished, the others will be void.

Dated at ................................................   this ............................................   day of ........................................., ...............

............................................................
Master

er ............................................................
By ............................................................   As Agents for the Master

**Tianjin Longwit Oils and Grains Industrial Co. Ltd.**
**Main Terms & Additional Chartering Clauses**
**March 1, 2007**

Owners guarantee that the following "**Tianjin Longwit Chartering Clauses**" will remain in force throughout the duration of this charter party together with any additional clause(s) or amendment(s) agreed between the Charterers and the vessel Owner and/or Operators

VEGOIL VOY Charter Party Terms with the following additional clauses

**Section 1: Charter Party Terms and Conditions:**

1. **Confidentiality and Non-Disclosure Clause**
   All charter party terms, rider clauses, and trade negations are confidential.  All parties agree not to disclose any confidential information to anyone other than those employees or contractors who need to know such confidential information for the execution of this charter party.

2. **Charter Party Administration Clause**
   Charter party terms and conditions are evidenced by the email fixture confirmation approved by both the Owner and the Charterer.  Unless specifically requested by either the Owner or the Charterer, there shall be no formal written and signed charter party.

3. **Invoice Clause**
   Owner's freight Invoice to be addressed to Tianjin Longwit Oils and Grains Industrial Co. Ltd . or nominee.

4. **Freight Payment Clause**
   ~~Freight to be paid directly to the Owner's account within 3 banking days upon completion of loading.~~
   As per main terms

5. **Charter Party Form -  VEGOILVOY Amendments Clause**

   A.          Clause 1B – DELETE
   B.          Clause 5B – DELETE
   C.          ~~Clause 6B – DELETE from "on payment……. Used laytime."~~ As per Vegoilvoy
   D.          ~~Clause 7E – after "squeegeeing please ADD "sweeping"~~ As per Vegoilvoy
   E.          ~~Clause 9C – DELETE "no deduction …….in the oil"~~ As per Vegoilvoy
   F.          Clause 11A – DELETE
   G.          Clause 15 – DELETE "if Charterer's……..as above."
   H.          Clause 27 – DELETE
   I.          ~~Clause 28 – DELETE from "subject…….Owner"~~ As per Vegoilvoy

   **Section 2: Bill of Lading Clauses**

6. **Non-Negotiable Bills of Lading Clause**
   Charterer's option for non-negotiable bill(s) of lading to be released at loading ports(s) for Customs clearance purposes upon completion of loading.  Original bill(s) of lading to marked

"FREIGHT PREPAID" and released/issued only upon confirmation from owners that the freight has been irrevocably remitted

7. **Clean On Board Ocean Bills of Lading Clause**
If required, bills of lading to be marked "CLEAN ON BOARD" and same to be signed by Owners accordingly. "CLEAN" in this context refers to the condition of the documentation, that is a clean bill of lading without clauses or blemishes or exceptions upon it. "CLEAN" in this context does not refer to the quality/quantity or condition of the commodity.

8. **Bill of Lading Clause**
If, required by Charterers, Owners to release "FREIGHT COLLECT" or FREIGHT AS PER CHARTER PARTY" bills of lading to shippers upon completion of loading. Bills of lading figures always to be based on shore weights and invoiced accordingly.

Charterer has the option to switch the bills of lading to "FREIGHT PREPAID" or "FREIGHT PAID", upon confirmation by the Owner of freight payment, or upon receipt of advice from the Charterer's remitting bank of irrevocable freight remittance.

If required by the Charterer, Owner agrees to replace the various sets of original bills of lading by consolidated set(s), provided that the total quantity loaded and all further terms and conditions are similar to the initial original sets, such exchange of bills of lading will be done on a like for like basis (I.e. quantity of received bills of ladings must be the same quantity of the requested replacement bills of lading).

9. **Shore Tank figure Clause**
Bill of Lading quantities always to be based on shore tank figures at load port(s).

## Section 3: Vessel Itinerary Clauses

10. **Itinerary Clause**
Charter Party to incorporate the following detailed itinerary information:

A.          Vessel's position at the time of fixture
B.          Vessel's last discharge port and discharging prospects, including estimated completion time and estimated sailing time.
C.          Vessel's estimated time of arrival for load port of this Charter Party Agreement.
D.          Owners/Master to serve 14/10/8/6/4/2/ days and 24 hour notice of arrival at load and discharge to Tianjin Longwit Oils and Grains Industrial Co. Ltd. Owner's are to keep Charterer posted immediately of any changes in the vessel's ETA and itinerary.

11. **Canceling Clause**
If it becomes apparent that the vessel will arrive at the first or sole loading port outside the canceling date, the Charterer has the option to:

A.          Mutually agree with the Owners on a new cancellation date or
B.          Cancel the charter party even before the cancellation date without penalty to either party.

## Section 4: Vessel Tanks, Cleaning, FOSFA and Cargo Clauses:

12. **Vessel Tank Clause**

The vessel's tanks are to be stainless steel or epoxy coated.

### 13. Stowage Plan
If requested, stowage plan shall be given to the Charterers before the arrival of the load port(s)

### 14. Cleanliness Clause
The vessel's tanks, pumps, pipelines and heating coils (if any), must always be clean of previous cargo, foreign odors, looses scales and rust.  Tanks coils and pipes must withstand required inspectors test and stream pressure of maximum 7kg/cm.  Any double bottoms beneath the tanks must be tested.  All pipelines, valves, and pumps must be clean and tight. In the event that the vessel is unable to conduct testing, a certificate of cleanliness, dryness and tightness of the tanks valves, pipes, hoses to be issued by the inspection company. Should the vessel fail to pass the first tank inspection by the Charterer's/Shipper's inspection company, the costs for all subsequent inspections to be for the Owner's account.

### 15. Cleaning Clause
Owners/Vessel to fully clean all tanks, lines and pumps to Charterer's inspector's satisfaction. All cleaning costs are always for the Owners account.

### 16. Last Cargo / FOSFA Clause
The vessel's last cargo unless otherwise specified shall be a product on the FOSFA International List of Exceptable/EU1 previous cargoes in effect at the time of fixing.  Vessels last three cargoes must not be either EDC or Styrene Monomer, except if the vessels tanks are stainless steel, in which case EDC or Styrene Monomer must not be the last two cargoes.

### 17. FOSFA Regulation Clause
Owner/Vessel/Master must comply with the following FOSFA International regulations for the carriage of vegetable oils:

A.          Operational procedures for ocean carriers in force at the date of fixing.
B.          Qualifications for all ships engaged in the ocean carriage and transshipment of oils and fats for edible or oleo chemical use in force at the time of fixing.

### 18. Pumping Clause
Owner warrant that each pumping facility of the vessel shall be capable of ~~displacing~~ discharging a min of two hundred (200) metric tons per hour of cargo or alternatively, of maintaining a minimum discharge pressure of one hundred (100) PSI at the vessel's rail/manifold. Failure to pump a this rate or to provide a minimum rail/manifold discharge pressure as stipulated will excuse the Charterer from payment for any vessel time on demurrage equivalent to the cumulative time period of the reduced pumping rate or lower discharge rail/manifold pressure (whether such period occur prior or after expiration of laytime) unless such reduced performance has been required by the Charterer or the receiving facility is unable to accept the aforesaid level of performance.  The vessel shall also be capable of discharging a minimum of two grades simultaneously.

With out prejudice to the laytime clause agreed, if required by the Charterer/Receiver, the Owner/Master is to maximize the discharge speed up to the receiving capacity of the shore facility.

### Section 5: Port, Loading, Discharging Laytime  Clauses

**19. Agents Clause**
    ~~Charterers~~ Owners to nominate agents at load port(s) and discharge ports(s), provided competitive.

**20. Port Regulation/Restriction Clause**
    The Owner/vessel is to comply will all port regulations and or restrictions as load and discharge ports. Any time lost due to vessel/Owner's non-compliance is to be for the Owner's account.

**21. Wharfage / Dockage / Dues Clause**
    Wharfage, dockage, quay dues, freight tax and any other port or vessel taxes are for the Owners account. Any taxes on the cargo are for the Charterer's account.

**22. Weather Clause**
    Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions and/or "sea state" shall count as half laytime or if on demurrage at half demurrage rate.

**23. Shifting Clause**
    ~~Charterers have the option to shift the vessel to additional berth(s) at Owners cost and time not to count.~~
    As per vegvoy clause 6b

**24. Ship-to-Ship or Double Banking Clause**
    ~~Charterer has the option to Load/Discharge by means of ship-to-ship transfer or double banking, providing Charterer to supply all necessary equipment (adequate fenders and flexible hoses) to ensure safer operations and to avoid damage to the vessel. This is always subject to the Master's discretion but same not to be unreasonably withheld. Any extra costs (including agency cost at ship-to-ship position, if any) and time involved due to this loading mode (from time vessel dropped anchor, to completion of loading/discharging) are to be for the Charterer's account. If such operations are declared, it shall not constitute as a load or discharge port and therefore Charterer will not be entitled to the six (6) hours after notice of readiness and on the conditions that the vessel needs to load from another port(s).~~

**25. Segregation Clause:**
    Cargo to be stowed separately and completely segregated from other Shippers' /Charterers' cargo, even if the same grade. Pumping from one tank to another on the same vessel is not allowed except for the requirements of safety. In the event that cargo transfer has to be preformed for safety reasons, a detailed written explanation must be provided to the Charterer. In the event of cargo transfer, all cost, consequences arising from such transfer, including but not limited to cargo shortage and/or contamination will be for the Owners account.

**26. Low Flash Cargo Clause**
    No low flash cargo allowed on board the vessel without prior consent from the Charterers.

**27. Dead freight Clause**
    Owners not to delay the releasing of all bills of lading for alleged dead freight. Dead freight disputes to be referred to arbitration if an amicable settlement cannot be reached.

**28. Cargo Retention Clause**
~~In the event that any cargo remains onboard upon completion of discharge, Charterers shall have the right to deduct from freight an amount equal to the FOB port loading value of such cargo, plus the freight charges due with respect thereto, provided that the volume of cargo remaining on board is pumpable and reachable by vessels fixed pumps, as determined by an independent Surveyor. Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.~~

**29. Notice Clause**
Total time to be reversible, including the allowable six (6) hours after the notice of readiness tendered for all ports. This applies even when the vessel is on demurrage. Six (6) hours notice of readiness at load and discharge port(s) to be given by the Master to the Shipper(s)/Receiver(s) as soon as the vessel has arrived, and is in every respect ready to load or discharge the cargo.

**30. Laytime Clause**
Time shall not count as laytime or if demurrage as demurrage time when used:

A.          For an inward passage moving from anchorage, including awaiting tugs, pilot, tide, daylight, locks, or any other reason(s) whatsoever which Charterers have no control, even if lighting has taken place at anchorage, until the vessel is securely moored at the berth or other loading or discharging place specified.

B.          Due to overflow, breakdown, inefficiency, repairs, contamination, or other causes attributable to the vessel and or Owners including the inability to pump out the cargo as provided in the pumping clause.

C.          As a result of strike, go slow, lockout, restraint by authorities, or restraint of labor involving the Master, Officers, or Crew of the Vessel or Tugs, or Pilot.

D.          In ballasting or deballasting, or awaiting the availability of the shore deballasting facilities, unless performed simultaneously without pumping of the cargo and without delaying the same.

E.          In clearing cargo tanks, pumps, pipelines bunkering not concurrent with loading or discharging of cargo, residues, or for any other purposes of the vessel only.

F.          ~~Three (3) hours to be allowed by Owner free of any demurrage for documents onboard~~

G.          The rule once on demurrage always on demurrage shall not apply to this charter party.

**31. Joint Laytime Clause**
When cargo is handled at a port for the account of other charterers in addition to Tianjin Longwit Oils and Grains Industrial Co. Ltd., laytime or, if the vessel is on demurrage, time on demurrage attributed to Charterer, shall be calculated as outlined below:

A.          All time after tender of notice of readiness until the vessel commences its inward passage to the loading or discharging berth(s) or place(s) (the first berth or place if more than one is to be used at the port) shall be allocated among all the charterers loading or discharging at that port in proportion to the quantities of their respective cargoes which are loaded or discharges at that port.

B.          All time between all fast and hoses disconnected at each loading port or discharging berth place; during which cargoes handled simultaneously shall be divided equally among all charterers whose cargoes are being handled simultaneously; and during which cargoes are

being handled separately shall be solely for the account of the charterer whose cargo is being handled separately.

C.        If more than on loading or discharging berths r place is used at the port, all time between hoses disconnect after completion of loading or discharging cargo at each berth or place and all fast at the next loading or discharging at berth or place in proportion to the quantities of their respective cargoes which are loaded or discharged at that berth or place.

D.        All time periods, (A), (B), (C), during which the vessel movement or cargo handling, as the case my be, is delayed fro reasons attributable to one or more charterers (and which is not excluded from laytime or time on demurrage by any provision of the relevant charter party) shall be solely for the account of the charterer(s) responsible for such delay.

### 32. Load/Discharge Clause

If the Vessel loads/discharges cargo for other Charterers at the berth(s), all time, including waiting time, time used, and/or time of demurrage, if any, is to be pro-rated in accordance with the respective cargo quantities of each Charterer.

Where waiting time, time used, and/or time on demurrage results from the act of any specific Charterer, such time will be attributed to such Charterer.

### 33. LOI Clause

At discharge port(s), if Receiver(s)/Consignee(s) are unable to produce the original Bills of Lading, Owners to release cargo against the Receiver(s)/Consignee(s)' acceptable original first class bank guarantee or Charterer's Letter of Indemnity (wording as per P & I Club Format) without bank guarantee. Owners to forward a copy of P & I Club format for Charterer's perusal and agreement prior to fixing vessel clean.

**Section 6: Vessel Class, Safety and Insurance Clauses:**

### 34. BIMCO Standard ISM Clause for Voyage or Time Charter

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this charter party, the Owners shall procure that both the vessel and 'the company' (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document of compliance (DOC) and the safety management certificate (SMC) to the Charterers.

Except as otherwise provided in this charter party, loss, damage, expense or delay caused by failure on the part of the Owners or 'The Company' to comply with the ism code shall be for the Owners' account.

### 35. ISPS Clause

A.

i.       From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to

Vessel is fully covered by a P&I Club acceptable to Charterers. Said P&I Club to be a member of IACS. Protection and Indemnity club to telex/fax Charterers' confirmation that the vessel is entered in the association for the current year and that there is no outstanding premium due, and that the vessel is not subjected to any breach of clubs rules.

**38. Vessel Suitability Clause**
The Vessel must be fit and in all respects suitable for carriage of edible oil. No copper and its alloy such as brass, bronze, and gun metal shall be used for any part of the Vessel's installation and or transport systems that has contact with the oils, such as piping, pipe connection, valves, heating coils, temperature gauges, auto gauging devices, high level alarms, fixed tank cleaning equipment, strainers, and pumps, or any sampling apparatus.

**Section 7: Other Clauses:**

**39. Time Bar Clause**
Charterers shall not be liable for any claims for demurrage, unless the Charterers receive claims, along with full supporting documents within ninety (90) days from the completion of discharge. Details of all supporting documents to be typed and included. Detailed time sheets and protest notes, showing total tonnage loaded and discharged at each respective berths/ports to be included on the demurrage invoice.

**40. Force Majuere Clause**
It is mutually agreed that neither party shall be liable for any loss, damage, or liquidated damages (including demurrage), occasioned by government intervention, war, strikes, rebellion, civil commotion, fire, acts of God, or any other cause of Force Majuere beyond either parties control that prevents the fulfillment of his or her obligations.

**41. Law and Arbitration Clause**
This Charter Party is governed by English Law. General average arbitration to be settled in London, England in accordance with York/Antwerp rules 1974 as amended 1994.

**42. Pollution Accident Clause**
In the event that the vessel is involved in collision, grounding, fire, explosion, spillage, or any other event, which causes loss of life, damage to the vessel or jetty or actual or potential pollution and is likely to affect the cargo shipment, third party or media interest, Charterer is to be advised at the earliest opportunity by phone to the following 24 hour numbers:

**EXHIBIT 2**

**Gregg Plunkett**

| | |
|---|---|
| **From:** | Chartering Th. B.E. Moors [chartering@berncobkk.com] |
| **Sent:** | Friday, March 30, 2007 1:56 PM |
| **To:** | Gregg Plunkett; Jo Tankers ASIA |
| **Subject:** | Mt Jo Lonn / Tianjin Longwit CP DD 16th March 2007 -Recap revised- |

   

charterparty      Jo            RMarpol Prewash   Tianjin Longwit Main
vegoilvoy.doc (11... Questionnaire 88_1? Clause.pdf (69...  Terms & A...

                                                        To:    Jo Tankers

Attn: Gregg Plunkett

Fm:   Jacob D. Lembring
      B.E. Moors

 :    Mt Jo Lonn / Tianjin Longwit CP DD 16th March 2007 -Recap
revised-


Good Afternoon Gregg,

Please find revised recap below with clauses attached, reflecting resent change of cargo
to be loaded.

*****
Charter Party:          Friday 16th March 2007

Chrtrs:         Tianjin Longwit Oils and Grains industrial Co. Ltd
                No. 136, The 5th Coastal Way
                Tianjin Port Free Trade Zone
                China, 300461
                Tel: 86 (0) 22 2576 0005
                Fax: 86 (0) 22 2576 3701


Owners:         Jo Tankers BV
                Societe Generale
                London
                United Kingdom
                IBAN code: SG51 SOGE 236391 31005200
                Swift: SOGEGB2LLON
                Through intermediary bank
                Societe Generale
                New York
                Swift: SOGEUS33


Vessel:         Jo Lonn / OOS (Q88 Attached)

For,
Cargo:          15,500mts RBD Olein 2% MOLOO
Loading:        1sb Belawan, Indonesia
Discharge:      1sb Tianjin, N. China

Freight:        USD$42.00pmt
Lay can:        April 10-25
Lay time:       125/125 shinc rev
Demm:           USD$20,000pdpr
Comm:           Total commission 2.5 pct on freight, demurrage, dead
freight payable to B.E. Moors Inc.

Freight Payment:    Freight to be t.t. remitted directly from
charterers to the owners' account BBB (Before Breaking Bulk)

```
C/P:                Vegoilvoy
Stowage:            Cargo will be stowed in Stainless Center Tanks

Other terms:
                    -Revised Tianjin Longwit Main Term Rider Clauses as per attached
                    -MARPOL Pre wash clause as per attached

Last Cargo:    Phosphoric Acid/palms/phos acid

Tentative itinerary

Paradip:        April 2 - 4
Haldia          April 4 - 6
Straits            April 11 - 16
Mid China    April 25 - 30
Tianjin          April 30 - May 5

*****

 ndly advice if all is in good order

Best Regards,
B.E. Moors Bangkok
Jacob D. Lembring
Office:     66-2-631-2323      Fax:         66-2-631-2788
Mob:        66-81-831-1604     Yahoo:       jacobdanmark
Skype:      jacobbemoors
E-mail:     chartering@bemcobkk.com
```